**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

MARY A. GILMORE                              CIVIL ACTION NO. 16-0546

VERSUS                                       JUDGE S. MAURICE HICKS, JR.

SPRINGHILL MEDICAL CENTER                    MAGISTRATE JUDGE HORNSBY

**MEMORANDUM RULING**

The Defendant, Springhill Medical Center ("Springhill") filed the present Motion for
Summary Judgment against Plaintiff, Mary Gilmore ("Gilmore") claiming Gilmore has
failed to meet her burden of showing the existence of an element essential to her race
discrimination, age discrimination, and retaliation claims. After careful consideration of all
parties' submissions, and the law applicable before the Court, Springhill's Motion for
Summary Judgment (Record Document 19) is **GRANTED**. Moreover, Gilmore's Motion
to Strike (Record Document 23) is **DENIED**.

**I.      BACKGROUND**

In January 2012, Gilmore, a black female over the age of forty, was hired as a
Registered Nurse at Springhill in the geriatric psychiatric unit known as the Reflections
Unit (the "Reflections Unit"). See Record Document 1 at 1, ¶ 4, Complaint; Record
Document 19-3 at 13-15, Gilmore Depo., Exhibit A. Gilmore's immediate supervisor was
Karen Budwah ("Budwah"). Budwah was hired as the Program Director of the Reflections
Unit on July 14, 2014. See Record Document 19-5 at 2, ¶¶ 3, 5, Budwah Decl., Exhibit C.
Budwah reported to the Chief Nursing Officer, Rhonda Perez ("Perez"). Perez was the
Chief Nursing Officer between September 2014 and June 2016. See Record Document
19-6 at 1, ¶ 3, Perez Decl., Exhibit D. Gilmore's job functions included, *inter alia*,

addressing concerns with co-workers professionally and privately, anticipating patient needs, cooperating with others, documenting medications, treatments, and nursing interventions on appropriate chart forms, providing safety measures, and complying with patient safety goals. See Record Document 19-3 at 14-15, Gilmore Depo.; Record Document 19-3 at 88, Job Description, Exhibit A-2.

At Springhill, patient fall prevention is a "huge priority." See Record Document 19-5 at 1, ¶ 7, Budwah Decl. (emphasis added). Springhill's employees, including Gilmore, were regularly trained on these guidelines, including but not limited to, occurrence reports, interventions, and post-fall huddles. See id. at ¶ 8. Gilmore attended staff meetings on August 12, 2014, September 26, 2014, and September 29, 2014 where patient falls were discussed. See Record Document 21-6 at 2-3, Reflections Staff Meeting Agenda, Exhibit 12. However, Gilmore struggled with this aspect of her job, namely, documentation of patient falls. On January 15, 2014, Dana Jones ("Jones"), currently the Chief Operating Officer at Springhill, but previously the Chief Nursing Officer between 2006 and 2014, spoke with Gilmore regarding the fall prevention guidelines. See Record Document 19-7 at 1, ¶¶ 3, 4, Jones Decl., Exhibit E. On July 28, 2014, Budwah had a 1:1 Review with Gilmore regarding the lack of proper documentation of a patient fall that occurred under her care. See Record Document 19-5 at 4, ¶ 22, Budwah Decl.; Record Document 19-5 at 7, Counseling Notes, Exhibit C-2. On September 4, 2014, Budwah met with Gilmore regarding the lack of documentation of a patient fall that occurred under her care. See Record Document 19-5 at 4, ¶ 23, Budwah Decl.; Record Document 19-5 at 8, Counseling Notes, Exhibit C-3. On October 17, 2014, Budwah met with Gilmore again regarding another patient fall that occurred during Gilmore's shift when she was the Charge Nurse.

See Record Document 19-5 at 4, ¶ 24, Budwah Decl.; Record Document 19-5 at 7, Counseling Notes, Exhibit C-4. However, Gilmore cites to her past performance review conducted on September 23, 2014 by Budwah to argue that she does not have performance issues. See Record Document 21-3 at 2, RN Evaluation, Exhibit 3. Gilmore contends that her performance review indicates that she "meets expectations." See id. Nonetheless, the performance review does note that she and Budwah "[h]ave reviewed/discussed plans for improvement in documentation." Id. at 7.

In keeping with its mission to make patient fall prevention a priority, Springhill created the fall Performance Improvement Team ("PIT") in September of 2014. See Record Document 19-5 at 2, ¶ 11, Budwah Decl. Perez and Budwah began working together to improve their training and procedures to prevent injuries. See Record Document 19-6 at 1, ¶ 5, Perez Decl.; Record Document 19-5 at 2, ¶ 12, Budwah Decl. In order to do this, they were looking at trends in patient falls (e.g., Were there common elements? Did the falls occur on the same shift? Were they all on days when they are busier? Did they occur on nights when there are less visitors, less people rounding?). See Record Document 19-6 at ¶ 5, Perez Decl. Perez noticed that more falls were occurring in the evening times, and in particular in the Reflections Unit. Id. at ¶ 6. Gilmore contests this factual statement, but offers no evidence to rebut it. Accordingly, Perez and Budwah began looking at staff members as a variable and noticed that most of the patient falls in the Reflections Unit occurred at night. Id.; Record Document 19-5 at 2, ¶ 13, Budwah Decl. Specifically, the patient falls occurred during shifts when Gilmore was the Charge Nurse. Id.; Record Document 19-5 at 2, ¶ 13, Budwah Decl. Gilmore also contests this factual statement, but offers no evidence to rebut it.

On November 6, 2014, Springhill suspended Gilmore citing concerns for patient safety and the need to further investigate and identify problems. See Record Document 19-6 at 1, ¶ 8, Perez Decl. Perez informed Gilmore that she was being placed on suspension "related to several trending items such as inappropriate documentation, recording of medications – including route, frequency, and dosage with multiple errors noted as well as a trend of patient falls with injuries." Id. at ¶ 9; see Record Document 19-6 at 6, Disciplinary Repor t Form, Exhibit D-1. Gilmore attests in her sworn declaration that she was never told of these violations and was not given specific enough details to dispute the charges. See Record Document 21-2 at 2, ¶ 5, Gilmore Decl. Exhibit 1. However, the evidence offered indicates otherwise because Gilmore signed the Disciplinary Report Form on November 6, 2014, which listed the reasons for the suspension, as well as signing other Disciplinary Report Forms detailing her past infractions. See Record Document 19-6 at 6, Disciplinary Report Form, Exhibit D-1. Gilmore also received verbal warnings. See Record Document 19-3 at 17, Gilmore Depo., Exhibit A. Further, Perez documented the meeting in a memorandum that was signed by Perez and witnessed by Budwah detailing the reasons for the suspension and the process going forward. See Record Document 19-6 at 8, Memorandum, Exhibit D-1. Gilmore believes the reason she was suspended were due to the staff being upset with her because she reported past violations. Specifically, on November 5, 2014, the day before she was suspended, Gilmore reported problems to Perez and Budwah relating to her nurse aide, Natasha Myers ("Myers"). See Record Document 21-2 at 1, Gilmore Decl., Exhibit 1. However, Gilmore offers no evidence that she reported past violations. Nonetheless, Gilmore does offer a sworn declaration from Ron Wollard ("Wollard"), a

patient at Springhill, specifically, the Reflections Unit. <u>See</u> Record Document 21-4 at 5, Wollard Decl., Exhibit 7. Wollard states that he "often overheard conversations by nurses on duty saying they were going to get rid of Gilmore" and that "[i]t seemed they were trying to get her fired." <u>Id.</u>

During the investigation of Gilmore, but also before, Perez not only discovered the substantial counseling Gilmore received relating to patient falls and proper documentation discussed *supra*, but that Gilmore had been caught sleeping on the job, and failed to dispose of methadone tablets in dereliction of her duty as a nurse. On November 6, 2014, Mark Goodson ("Goodson"), a shift supervisor at Springhill, emailed Perez stating that he caught Gilmore sleeping. <u>See</u> Record Document 19-6 at 11, Goodson Email, Exhibit D-3. On November 7, 2014, Vickie Horn ("Horn"), a Licensed Practical Nurse at Springhill, emailed Budwah stating that she discussed with Budwah and Perez that Gilmore slept during her shifts which occurred nightly up until about a month prior to November 7, 2014, but still occurred frequently. <u>See</u> Record Document 19-5 at 10, Vickie Horn Email, Exhibit C-5. Furthermore, Kristi Joyce ("Joyce"), a Registered Nurse at Springhill, who worked with Gilmore in the Reflections Unit declared that she personally witnessed Gilmore sleeping on the job. <u>See</u> Record Document 22-2 at 1, ¶¶ 3-5, Joyce Decl., Exhibit H. In or around the end of May 2014 and beginning of June 2014, Joyce took photographs/video of Gilmore sleeping on the job. <u>See id.</u> at ¶ 6. During Perez's investigation, Joyce attests that she sent Perez a copy of the photographs/video of Gilmore sleeping during her shift. <u>See id.</u> at ¶ 7. The photographs/video are before the Court and are subject to Gilmore's Motion to Strike that will be discussed *infra*. Lastly, Perez discovered that on July 19, 2014, Gilmore improperly disposed of two methadone

tablets in dereliction of well-known nursing practices. <u>See</u> Record Document 19-7 at 2, ¶ 5, Jones Decl., Exhibit E; Record Document 19-7 at 5, Disciplinary Report Form, Exhibit E-2; Record Document 19-6 at 2, ¶ 10, Perez Decl.

On November 7, 2014, Perez emailed Ashley Ortego ("Ortego"), who works in the Human Resources Department, highlighting the past performance issues of Gilmore and recommending that Springhill terminate Gilmore. <u>See</u> Record Document 21-6 at 9, Perez Email, Exhibit 14. Following the investigation, on November 14, 2014, Perez, Budwah, and Ortego, terminated Gilmore's employment in the interest of patient safety. <u>See</u> Record Document 19-5 at 3, ¶ 18, Budwah Decl. A Disciplinary Report Form was completed noting Gilmore had committed "willful violations of safety standards and other standards which compromised the physical well-being of patients, coworkers, and the organization." <u>See</u> Record Document 19-3 at 160-62, Disciplinary Report Form, Exhibit A-24; Record Document 19-3 at 73-74, Gilmore Depo.; Record Document 19-5 at 3, ¶ 19, Budwah Decl. The Disciplinary Report Form notes some of Gilmore's previous warnings—written warning on November 6, 2014 for performance, verbal warning on October 27, 2014 for sleeping, and verbal warning on July 29, 2014 for improperly wasting narcotics. <u>See</u> Record Document 19-3 at 160-62, Exhibit A-24; Record Document 19-3 at 73-74, Gilmore Depo. The Disciplinary Report Form states that Gilmore is being terminated for "unsafe behavior," "failing to follow instructions," "poor work quality," and "sleeping on the job." Record Document 19-3 at 160.

Following her termination, Gilmore appealed the decision to the Chief Executive Officer of Springhill, Vince Sedminik ("Sedminik"). <u>See</u> Record Document 19-3 at 79, Gilmore Depo. Sedminik advised Gilmore that he would speak to Jones, Perez, Budwah,

and Ortego about the decision to terminate Gilmore. <u>See id.</u> at 80. Sedminik conferred with Budwah and Perez, who both advised him of Gilmore's performance problems and stated they would be uncomfortable with the safety of Springhill's patients if Gilmore was allowed to be reinstated. <u>See</u> Record Document 19-6 at 3, ¶ 13, Perez Decl.; Record Document 19-5 at 3, ¶ 20, Budwah Decl. On November 18, 2014, Sedminik met with Gilmore again and advised her that he agreed with the staff's decision to terminate her employment. <u>See</u> Record Document 19-3 at 80, Gilmore Depo. However, Gilmore alleges in her Complaint that the decision was not based on safety concerns. Gilmore contends that Sedminik "told her he was going with an all-white administrative staff." Record Document 1 at 4, ¶ 14. Nonetheless, Gilmore contradicts this statement in her declaration and deposition where she says Sedminik told her he was changing administrative personnel, and named only white nurses and "he did not really say he was going with an all-white administrative staff." <u>See</u> Record Document 21-2 at 2, ¶ 7, Gilmore Decl. Exhibit 1; Record Document 19-3 at 78, Gilmore Depo., Exhibit A.

On March 4, 2015, Gilmore filed a charge with the Equal Employment Opportunity Commission (EEOC), alleging discrimination because of her race, age, and retaliation. Record Document 1 at 4, ¶ 19, Complaint. The EEOC notified Gilmore by letter dated January 27, 2016 that she was entitled to initiate a civil action in the United States District Court as provided in 42 U.S.C. § 2000e-5(e) and (f). <u>See</u> Record Document 1-2, Notice of Suit Rights. On April 22, 2016, Gilmore filed suit with this Court asserting a Title VII race discrimination claim, an Age Discrimination in Employment Act ("ADEA") claim, and a claim for retaliation. <u>See</u> Record Document 1.

Springhill asserts that it had legitimate, nondiscriminatory reasons for terminating Gilmore. See Record Document 19-1 at 26, Memorandum in Support of Defendant's Motion for Summary Judgment. Gilmore argues that those reasons offered are pre-textual and the evidence offered by Springhill is not competent summary judgment evidence. See id. However, Springhill's primary argument is that Gilmore has offered no evidence to support her allegations that Springhill's reasons were pre-textual. Lastly, Springhill contends that Gilmore's retaliation claim fails as a matter of law because it is based on post-termination conduct thereby eliminating any casual connection. See id. at 27.

## II.    LAW AND ANALYSIS

### A.    Summary Judgment Standard.

Rule 56 of the Federal Rules of Civil Procedure governs summary judgment. This rule provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order for the court to find there are no genuine material factual issues, the court must be satisfied that no reasonable trier of fact could have found for the nonmoving party or, in other words, that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict for the non-movant. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 106 S. Ct. 2505, 2511 (1986). Also, "a party asserting that a fact cannot be or is genuinely disputed must support the motion by citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment." Fed. R. Civ. P. 56(e)(3).

In a summary judgment motion, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings . . . [and] affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (internal quotations and citations omitted). If the movant meets this initial burden, then the non-movant has the burden of going beyond the pleadings and designating specific facts that prove that a genuine issue of material fact exists. See id. at 324, 106 S. Ct. at 2553; see Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994). A non-movant, however, cannot meet the burden of proving that a genuine issue of material fact exists by providing only "some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." Little, 37 F.3d at 1075. Similarly, "unsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a motion for summary judgment." Clark v. Am's Favorite Chicken, 110 F.3d 295, 297 (5th Cir. 1997).

In reviewing a motion for summary judgment, the court is to view "the facts and inferences to be drawn therefrom in the light most favorable to the non-moving party." Tubos de Acero de Mexico, S.A. v. Am. Int'l Inv. Corp., Inc., 292 F.3d 471, 478 (5th Cir. 2002); see also Harris v. Serpas, 745 F.3d 767, 771 (5th Cir. 2014). Further, the district court does not make credibility determinations or weigh evidence. EEOC v. Chevron Phillips Chemical Co., LP, 570 F.3d 606, 612 n.3 (5th Cir. 2009). However, when there is video evidence available in the record, the court is not bound to adopt the nonmoving party's version of the facts if it is contradicted by the record, but rather should "review[ ]

the facts in the light depicted by the videotape." <u>Scott v. Harris</u>, 550 U.S. 372, 381, 127 S. Ct. 1769, 1776 (2007); <u>see also</u> <u>Carnaby v. City of Houston</u>, 636 F.3d 183, 187 (5th Cir.2011) ("Although we review evidence in the light most favorable to the nonmoving party, we assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene.").

### B.   Gilmore's Motion to Strike Springhill's Summary Judgment Evidence.

Federal Rule of Civil Procedure 12(f) allows the court to strike "from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). A motion to strike under Rule 12(f) "is a drastic remedy to be resorted to only when required for the purposes of justice." <u>Augustus v. Bd. of Pub. Instruction of Escambia Cnty., Fla.</u>, 306 F.2d 862, 868 (5th Cir. 1962); <u>see also</u> <u>Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.</u>, 677 F.2d 1045, 1057 (5th Cir. 1982) ("[M]otions to strike a defense are generally disfavored, . . ."). A motion to strike should be granted only when "the allegations are prejudicial to the defendant or immaterial to the lawsuit." <u>Johnson v. Harvey</u>, Civil Action No. 96-3438, 1998 U.S. Dist. LEXIS 14203, at *20 (E.D. La. Sept. 8, 1998) (citation omitted). Immateriality is established by showing that the challenged allegations "can have no possible bearing upon the subject matter of the litigation." <u>Bayou Fleet P'ship, LLC v. St. Charles Par.</u>, Civil Action No. 10-1557, 2011 U.S. Dist. LEXIS 73867, at *16 (E.D. La. July 8, 2011) (citations omitted).

Gilmore argues that Springhill's Exhibits A-20, D-2, and H should be stricken from the record because the photographs/video of her sleeping on the job are not properly authenticated. <u>See</u> Record Document 23-1, Memorandum in Support of Motion to Strike. Specifically, Gilmore claims that authentication is needed "to show that the person in the

photographs/video was Gilmore, that the photograph was real and not doctored, or provide any background as to the circumstances under which the photograph was taken. Gilmore claims the use of the photographs and video raise questions about the place, time, and date they were taken." Id. at 1. Springhill argues that the photographs/video were properly authenticated via the declaration under penalty of perjury pursuant to 28 U.S.C. § 1746 by Joyce.

Federal Rule of Evidence 901(a) provides: "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." "[A] document such as a photograph can be authenticated by testimony of a person with personal knowledge indicating that it is what it is claimed to be." Greco v. Velvet Cactus, LLC, Civil Action No. 13-3514, 2014 U.S. Dist. LEXIS 87778, at *12 (E.D. La. June 27, 2014) (finding a declaration of business owner sufficiently authenticated photograph of workplace policy). In her declaration, Joyce states that she "personally witnessed Ms. Gilmore sleeping during her shift" and the referenced photographs and video are "true and correct copies" of "Ms. Gilmore sleeping during her shift" that she personally took the video/photographs in or around May 2014 and June 2014, respectively. Record Document 22-2 at 1-2, ¶¶ 5, 8-9, Joyce Decl., Exhibit H. Joyce's attestations directly respond to Gilmore's concerns, showing that:

(1)     The person in the photographs and video is Gilmore. Joyce attests that the evidence presented are "photographs of Ms. Gilmore" and "video of Ms. Gilmore" sleeping;

(2)     The photographs are real and not doctored. Joyce attests that the photographs and video are "true and correct copies";

(3)      There is background as to the circumstances. Joyce attests that "Ms. Gilmore [is] sleeping"; and

(4)      The place/time and date are established. Joyce attests that the photographs and video were taken "during her shift . . . in or around May 2014" and "during her shift (on a separate occasion) . . . in or around June 2014."

Id. Therefore, the Court finds that the photographs/video of Gilmore sleeping are properly authenticated under Federal Rule of Evidence 901. See, e.g., Conceal City, L.L.C. v. Looper Law Enforcement, LLC, Civil Action No. 3:10-CV-2506-D, 2011 U.S. Dist. LEXIS 131415, *38, fn. 18 (N.D. Tex. Nov. 15, 2011) ("the photographs are properly authenticated under Fed. R. Evid. 901 by Wade's declaration, in which he avers that the photographs are true and correct copies of the photographs. For purposes of this motion, this evidence is sufficient to support a finding that the matter in question is what its proponent claims.") (internal citations omitted). Furthermore, it should be noted that Springhill uses the video/photographs of Gilmore sleeping on the job as a defense to Gilmore's discrimination claims and "motions to strike a defense are generally disfavored" by the courts. See Kaiser, 677 F.2d at 1057. Accordingly, Gilmore's Motion to Strike is **DENIED**.

     **C.**      **Gilmore's Objections to Springhill's Summary Judgment Evidence.**

     Gilmore seeks to defeat Springhill's Motion for Summary Judgment by having the Court strike certain evidence from the record. Gilmore in her opposition to Springhill's Motion for Summary Judgment argues that Springhill relies upon hearsay and questionable evidence. Specifically, Gilmore argues that Budwah's declaration contains hearsay in items numbered 15, 17, 18, 25, and 27 relating to employee complaints. See Record Document 21 at 7, Opposition to Defendant's Motion for Summary Judgment. Gilmore also contends that Perez's declaration contains hearsay in items numbered 7,

10, 11, 12, 15, 16, 19, and 20 relating to employee complaints and her review of records. See id. In sum, Gilmore argues that the declarations of Budwah and Perez are not competent summary judgment evidence because they are conclusory, made without personal knowledge, and contain hearsay. See id.

Rule 56(c)(4) of the Federal Rules of Civil Procedure provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Unsworn declarations may substitute for an affiant's oath if the statement contained therein is made "under penalty of perjury" and verified as "true and correct." DIRECTV, Inc. v. Budden, 420 F.3d 521, 530-31 (5th Cir. 2005); see also 28 U.S.C. § 1746. At the summary judgment stage, evidence relied upon need not be presented in admissible form, but it must be "*capable* of being 'presented in a form that would be admissible in evidence.'" LSR Consulting, LLC v. Wells Fargo Bank, N.A., 835 F.3d 530, 534 (5th Cir. 2016) (quoting Fed. R. Civ. P. 56(c)(2)) (emphasis added). Neither legal conclusions nor statements made without personal knowledge are capable of being so presented. See Fed. R. Evid. 602, 701, 702.

Gilmore's objects to the following declarations of Budwah and Perez:

**Budwah's declaration paragraph 15 states:** Ms. Perez and I reviewed Dana Jones' counseling session with Ms. Gilmore on January 15, 2014, my counseling session with Ms. Gilmore on July 24, 2014 regarding Ms. Gilmore's improper waste of narcotic medication, my 1:1 Review with Ms. Gilmore on July 28, 2014 regarding the lack of proper documentation of the patient's fall, my counseling session with Ms. Gilmore on September 4, 2014 regarding lack of documentation of patient falls, and my counseling session with Ms. Gilmore on October 17, 2014 regarding her failure to adhere to the fall prevention guidelines.

**Budwah's declaration paragraph 17 states:** During the investigation, we learned that Ms. Gilmore had been caught sleeping on the job on numerous occasions, and we received complaints that Ms. Gilmore routinely refused to assist other nurses with patients.

**Budwah's declaration paragraph 18 states:** After the investigation, Ms. Ashley Ortego (HR), and I met and made the decision to terminate Ms. Gilmore based on Ms. Gilmore's repeated violations of safety standards and other standards that compromised patient safety and patient care.

**Budwah's declaration paragraph 25 states:** Attached as exhibit 5 to this Declaration (SMC 000554) is a true and correct copy of an e-mail I received from Vicki Horn, a Springhill Licensed Practical Nurse, during the investigation of Ms. Gilmore.

**Budwah's declaration paragraph 27 states:** During my tenure at Springhill, no one has reported to me about a nurse falling asleep during her shift (other than reports about Ms. Gilmore).

**Perez's declaration paragraph 7 states:** I spoke to Ms. Budwah (Plaintiff's immediate supervisor) about my concerns with Ms. Gilmore's performance, and I reviewed Ms. Gilmore's personnel file and realized there were records of past documentation errors and lack of attention to detail that resulted in incorrect medical administration records, missed patient medications, and incomplete in-patient admit recordation, and less thorough rounding. I did not intend to place blame on Ms. Gilmore or anyone else but, rather, to make improvements in patient fall prevention (e.g., Did the nurses know the protocol? Was the staff educated on the use of this equipment?).

**Perez's declaration paragraph 10 states:** During Ms. Gilmore's suspension, Ms. Budwah and I investigated Ms. Gilmore's performance problems and confirmed the past documentation errors and lack of attention to detail that resulted in incorrect medication administration records, missed patient medications, and incomplete in-patient admit recordation, and less thorough rounding. In addition to those deficiencies and her failure to adhere to the patient fall guidelines, it was discovered that there were reports of Ms. Gilmore sleeping on the job and failing to assist coworkers with patients. I asked employees (coworkers and supervisors alike) who reported these problems to send me written statements.

**Perez's declaration paragraph 11 states:** After the investigation, I met with Ms. Ashley Ortego (HR/Risk Manager) and Ms. Budwah and we made the decision to terminate Ms. Gilmore based on Ms. Gilmore's repeated violations of safety standards and other standards that compromised patient safety and patient care. We agreed that patient care and preventable patient

falls require, among other things, the Charge Nurse actually being awake during her shift, making frequent rounds, and ensuring that the patient's equipment is properly functioning.

**Perez's declaration paragraph 12 states:** After the review of Ms. Gilmore's personnel file and the investigation, Ms. Ortego and I met with Springhill CEO Vince Sedminik. We advised Mr. Sedminik of Ms. Gilmore's performance deficiencies discovered during the investigation (as set forth above in paragraph 10) that resulted in a lack of continuity in patient care. We advised Mr. Sedminik that we recommended Ms. Gilmore be terminated, and Mr. Sedminik verbally agreed with our recommendation.

**Perez's declaration paragraph 15 states:** Attached as Exhibit 2 to this Declaration (SMC 000908-000910) are true and correct copies of photographs of Ms. Gilmore that I received from Kristie Joyce (a Springhill Registered Nurse) during my investigation in November 2014.

**Perez's declaration paragraph 16 states:** Attached as Exhibit 3 to this Declaration (SMC 000553) is a true and correct copy of an e-mail I received from Mark Goodson (a Springhill Shift Supervisor) during my investigation in November of 2014.

**Perez's declaration paragraph 19 states:** Attached as Exhibit 20 to Ms. Gilmore's Deposition (Exhibit A) referenced in Springhill's Motion for Summary Judgment is a true and correct copy of a video of Ms. Gilmore sleeping during her shift that I received from Kristie Joyce (a Springhill Registered Nurse) during my investigation in 2014.

**Perez's declaration paragraph 20 states:** In March 2015, Springhill received notice from the Louisiana State Board of Nursing regarding a complaint received about Ms. Shea Dicks (a Springhill RN) leaving a patient in seclusion. I conducted an internal investigation and determined that there was nothing to support this allegation and I advised the Louisiana State Board of Nursing of the same.

After review of the record, including Gilmore's opposition to Springhill's Motion for Summary Judgment, the Court **OVERRULES** Gilmore's objections. The Court's decision is based on Gilmore's failure to provide sufficient and compelling reasons for the evidence to be excluded. Gilmore in her opposition merely states that Budwah's declaration contains hearsay in items numbered 15, 17, 18, 25, and 27 relating to employee complaints. Record Document 21 at 7, Opposition to Defendant's Motion for Summary

Judgment. She submits that Perez's declaration contains hearsay in items numbered 7, 10, 11, 12, 15, 16, 19, and 20 relating to employee complaints and her review of records. Id. The Court has no obligation to raise and analyze a party's position in the absence of that party meaningfully briefing the point. Cf. United States v. Griffith, 522 F.3d 607, 610 (5th Cir. 2008) ("It is a well-worn principle that the failure to raise an issue on appeal constitutes waiver of that argument").

### D. Gilmore's Title VII Race Discrimination Claim.

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race. See 42 U.S.C. § 2000e-2(a)(1). In order to survive summary judgment, Gilmore must raise a "genuine issue as to a[ ] material fact" that Springhill discriminated against her. Fed. R. Civ. P. 56(c). To do so, Gilmore must satisfy the burden shifting test enunciated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973). "McDonnell Douglas and subsequent decisions have established an allocation of the burden of production and an order for the presentation of proof, whereby a plaintiff must [first] establish a *prima facie* case of discrimination." Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 142, 120 S. Ct. 2097, 2106 (2000). To establish a Title VII *prima facie* case of race discrimination claim, a plaintiff must provide evidence "that she: (1) is a member of a protected class; (2) was qualified for her position; (3) was subject to an adverse employment action; and (4) was replaced by someone outside the protected class, or, in the case of disparate treatment, shows that others similarly situated were treated more favorably." Okoye v. Univ. of Tex. Houston Health Sci. Ctr., 245 F.3d 507,

512-513 (5th Cir. Tex. 2001) (quoting <u>Shackelford v. Deloitte & Touche, LLP</u>, 190 F.3d 398, 404 (5th Cir. 1999)).

"A plaintiff's *prima facie* case creates an inference of discrimination that shifts the burden of production to the defendant to come forward with evidence that the adverse employment action was taken for a legitimate, nondiscriminatory reason." <u>Parker v. State of Louisiana Dep't of Educ. Special Sch. Dist.</u>, 323 F. App'x 321, 327 (5th Cir. 2009). "Once the employer articulates a legitimate, nondiscriminatory reason and produces competent summary judgment evidence in support of it, the inference created by the *prima facie* case drops out of the picture." <u>Id.</u> at 327.

A plaintiff now bears the burden of offering evidence that raises a genuine issue of material fact that the employer discriminated against her. <u>See</u> <u>Okoye</u>, 245 F.3d at 513. "To carry this burden, the plaintiff must produce substantial evidence indicating that the proffered legitimate, nondiscriminatory reason is a pretext for discrimination." <u>Laxton v. Gap Inc.</u>, 333 F.3d 572, 578 (5th Cir. 2003). "A plaintiff may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or 'unworthy of credence.'" <u>Id.</u> at 578 (quoting <u>Wallace v. Methodist Hosp. Sys.</u>, 271 F.3d 212, 220 (5th Cir. 2001)). "[A] plaintiff relying upon evidence of pretext to create a fact issue on discriminatory intent falters if he fails to produce evidence rebutting all of a defendant's proffered nondiscriminatory reasons." <u>Machinchick v. PB Power, Inc.</u>, 398 F.3d 345, 351 (5th Cir. 2005). The Supreme Court in <u>Reeves</u> has acknowledged that*, "*a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false" may be sufficient to infer discrimination. 530 U.S. at 149, 120 S. Ct. at 2109. However, "[t]he Supreme Court has

also made clear, however, that 'instances [exist] where, although the plaintiff has established a *prima facie* case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.'" Okoye, 245 F.3d at 514 (quoting Reeves, 530 U.S. at 149, 120 S. Ct. at 2109). Furthermore, the Fifth Circuit has noted "[t]he *rare* instances in which a showing of pretext is insufficient to establish discrimination are: (1) when the record conclusively reveals some other, nondiscriminatory reason for the employer's decision, or (2) when the plaintiff creates only a weak issue of fact as to whether the employer's reason was untrue, and there was abundant and uncontroverted evidence that no discrimination occurred." Laxton, 333 F.3d at 578.

### i. Gilmore's *prima facie* case of race discrimination.

The first three prongs of Gilmore's *prima facie* case for race discrimination are not in dispute. Gilmore is black, qualified for the position of nurse, and her employment with Springhill was terminated. However, the fourth and final prong is in dispute. The fourth prong requires Gilmore to prove that she was replaced by someone outside of her protected class, or, in the case of disparate treatment, show that others similarly situated were treated more favorably. In the present action, Gilmore presents the Court with evidence that she was replaced by someone outside of her protected class. On December 12, 2014, Springhill hired Larry Smart, a fifty-six year old white male, who was a registered nurse. See Record Document 21-7 at 2, Exhibit 15, Employment Records; Record Document 19-5 at 4, ¶ 28, Budwah Decl., Exhibit C. Springhill ignores Gilmore's argument that she was replaced by someone outside of her protected class and instead focuses on a disparate treatment analysis where a plaintiff must show that others similarly situated

were treated more favorably. However, the Court will decide this case on the issue of pretext. Therefore, the Court assumes without deciding that Gilmore has met this prong of her *prima facie* case.

### ii. Springhill's reasons for terminating Gilmore.

Because the Court assumes that Gilmore has met her initial burden, the burden of production now shifts to Springhill to provide a "legitimate, nondiscriminatory reason" for terminating Gilmore's employment. "In order to meet its burden, [Springhill] must provide both 'clear and reasonably specific reasons' for its actions." <u>Okoye v. Univ. of Tex. Houston Health Sci. Ctr.</u>, 245 F.3d 507, 513 (5th Cir. Tex. 2001) (quoting <u>Texas Dept. of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 258, 101 S. Ct. 1089, 1096 (1981)).

The Disciplinary Report Form notes that Gilmore was terminated for demonstrating "unsafe behavior," "failing to follow instructions," "poor work quality," and "sleeping on the job." <u>See</u> Record Document 19-3 at 160, Disciplinary Report Form, Exhibit A-24. In sum, Gilmore was terminated due to excessive patient falls and failure to properly document such falls, sleeping on the job, and failure to properly dispose of two methadone tablets and properly document the disposal. The Court will address each of Springhill's reasons for terminating Gilmore separately.

### 1. Patient falls.

In the present action, Springhill cites to the recurrence of patient falls during Gilmore's shift and failing to properly document the falls and take the necessary precautions as one of the reasons for her termination. Springhill offers evidence from multiple parties, specifically Jones and Budwah, who attest to counseling Gilmore on numerous occasions on her failure to properly document patient falls and reviewing the

patient fall guidelines with Gilmore. See Record Document 19-7, Jones Decl., Exhibit 4; Record Document 19-5, Budwah Decl., Exhibit C. Further, Springhill provides the Court with documentary evidence of each meeting between Jones, Budwah, and Gilmore concerning patient falls. Accordingly, the Court finds that this reason alone was clear and specific, and constitutes a legitimate, nondiscriminatory reason for terminating Gilmore. Therefore, Springhill has met its burden of production.

## 2. Sleeping on the job.

However, assuming *arguendo* that patient falls were not a legitimate, nondiscriminatory reason for terminating Gilmore, sleeping on the job certainly is. See, e.g., Pinegar v. Baptist Mem'l Hosp.-Desoto Cnty., Civil Action No. 2:96-63, 1997 U.S. Dist. LEXIS 13510, at *9 (N.D. Miss. Aug. 18, 1997) (granting defendant's summary judgment motion because its legitimate reason for plaintiff's termination—a nurse sleeping on the job—was uncontroverted). During Perez's investigation, several coworkers and supervisors reported that Gilmore slept on the job. Specifically, Horn emailed Budwah stating that she discussed with Budwah and Perez that Gilmore slept during her shifts which occurred nightly up until about a month prior to November 7, 2014, but still occurred frequently. See Record Document 19-5 at 10, Vickie Horn Email, Exhibit C-5. Goodson also emailed Perez stating that he caught Gilmore sleeping. See Record Document 19-6 at 11, Goodson Email, Exhibit D-3. Furthermore, Joyce declared that she personally witnessed Gilmore sleeping on the job and that she sent Perez a copy of the photographs/video of Gilmore sleeping during her shift. See Record Document 22-2 at 1, ¶¶ 5, 7, Joyce Decl., Exhibit H; Record Document 19-3 at 159, Video, Exhibit A-20; Record Document 19-6 at 9-10, Photographs, Exhibit D-2. Gilmore even admits in her

deposition that she was caught "dozing off" during her shift by her supervisors Lance Davenport and Mark Goodson. See Record Document 19-3 at 17-18, 67-68, Gilmore's Depo., Exhibit A. Accordingly, the Court finds that this reason alone was clear and specific, and constitutes a legitimate, nondiscriminatory reason for terminating Gilmore. Therefore, Springhill has met its burden of production.

### 3. Improper disposal and documentation of methadone tablets.

On July 19, 2014, Gilmore disposed two methadone tablets, but in dereliction of well-known nursing practices because a witness's signature was not obtained. See Record Document 19-3 at 53-57, Gilmore Depo., Exhibit A; Record Document 19-3 at 153, Incident Report Form, Exhibit A-16, Record Document 19-7 at 2, ¶ 5, Jones Decl., Exhibit E. In the nursing workspace, this is an egregious error because methadone is a Schedule II narcotic. See id. at ¶ 5, Jones Decl. Budwah met with Gilmore on July 23, 2014, and Gilmore was written up. See Record Document 19-3 at 53, Gilmore Depo.; Record Document 19-3 at 153, Incident Report Form. As noted by Budwah in the Incident Report Form and in Budwah's counseling notes, Gilmore said she dropped the pills on the floor and threw them away because another nurse was not working that night to act as a witness. See id. at 154-55, Incident Report Form and Counseling Notes. Jones and Budwah also completed (and Gilmore signed) a Disciplinary Report Form on July 28, 2014 for her inappropriate waste of narcotics. See Record Document 19-3 at 55, Gilmore Depo.; Record Document 19-3 at 156, Disciplinary Report Form, Exhibit A-16. Gilmore admitted that she told Jones: "I know I was wrong. I take full responsibility." See id. at 57, Gilmore Depo.

Given the stringent protocol instituted by the medical profession in relation to certain prescription medicine and the rampant opioid epidemic this country faces, this was a highly improper way to dispose of narcotics as this scenario unquestionably requires a second staff member to witness the destruction of the pills. The Court is not in a position to say this reason alone was a terminable offense, but coupled with Gilmore's other infractions, the Court finds that this was clear and specific, and constitutes a legitimate, nondiscriminatory reason for terminating Gilmore. Therefore, Springhill has met its burden of proof.

### iii.    Whether Springhill's reasons for terminating Gilmore were pre-textual.

In the present action, Gilmore has failed to produce evidence rebutting all of Springhill's proffered nondiscriminatory reasons. In fact, as indicated *supra*, Gilmore admits to "dozing off" and improperly disposing of two methadone tablets and failing to properly document the disposal. Furthermore, the record conclusively reveals that Gilmore was terminated because of her less than stellar personnel file and reputation at Springhill as it relates to patient safety, i.e., Discipline Report Forms, photographs/video of her sleeping, declarations from Gilmore's supervisors and coworkers, counseling notes, rather than because she was black. Gilmore attempts to raise a genuine issue of material fact that she was discriminated against by offering the sworn declaration of one of her patients, Wollard. See Record Document 21-4 at 5, Wollard Decl., Exhibit 7. Wollard states that he "often overheard conversations by nurses on duty saying they were going to get rid of Gilmore" and that "[i]t seemed they were trying to get her fired." Id. This statement is hearsay. Wollard is unable to cite to the nurses making such statements or the time such statements were made. Even if the Court were to consider this affidavit as

competent summary judgment evidence, Gilmore still fails to rebut each of Springhill's reasons for terminating her employment. See Machinchick v. PB Power, Inc., 398 F.3d 345, 351 (5th Cir. 2005) ("[A] plaintiff relying upon evidence of pretext to create a fact issue on discriminatory intent falters if he fails to produce evidence rebutting all of a defendant's proffered nondiscriminatory reasons.").

Springhill has presented the Court with abundant, uncontroverted evidence that no discrimination occurred in the decision to terminate Gilmore. Rather than producing competent summary judgment evidence of her own to raise a genuine issue of material fact to defeat Springhill's Motion for Summary Judgment, Gilmore seeks to defeat Springhill's Motion by seeking an order striking certain evidence from the record. This tactic indicates to the Court the weakness of Gilmore's position. Furthermore, the Court finds that Gilmore's sworn declaration is self-serving that lacks any sort of corroborating evidence. See State Farm Fire & Cas. Co. v. Delta Beverage Grp. Inc., 401 F. App'x 955, 959 (5th Cir. 2010) ("an affidavit presenting self-serving factual allegations" without corroborating evidence does not defeat summary judgment.). Gilmore's affidavit stating that her position had already been posted before she was suspended is self-serving because there is no evidence corroborating this statement. There is no picture of the posting or another coworker attesting to the existence and timing of the alleged posting. Another example of Gilmore's sworn declaration being self-serving pertains to Gilmore's statement in her Complaint that Sedminik "told her he was going with an all-white administrative staff." Record Document 1 at 4, ¶ 14. This allegation is contradicted in Gilmore's own sworn declaration and deposition where she says Sedminik told her he was changing administrative personnel, and "he did not really say he was going with an

all-white administrative staff." <u>See</u> Record Document 21-2 at 2, ¶ 7, Gilmore Decl. Exhibit 1; <u>see</u> Record Document 19-3 at 78, Gilmore Depo., Exhibit A.

Accordingly, the Court finds that not only has Gilmore failed to offer sufficient evidence to reject Springhill's reasons for terminating her, no rational factfinder could conclude that terminating Gilmore was discriminatory. <u>See</u> <u>Okoye v. Univ. of Tex. Houston Health Sci. Ctr.</u>, 245 F.3d 507, 514 (5th Cir. Tex. 2001) (quoting <u>Reeves v. Sanderson Plumbing Prod., Inc.</u>, 530 U.S. 133, 149, 120 S. Ct. 2097, 2109 (2000)) ("[t]he Supreme Court has also made clear, however, that 'instances [exist] where, although the plaintiff has established a *prima facie* case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.'"). Therefore, Gilmore's Title VII race discrimination claim is **DISMISSED**.

### E.    Gilmore's Age Discrimination Claim.

The Age Discrimination in Employment Act of 1967 (ADEA) makes it unlawful for an employer to discharge any individual or otherwise discriminate against her with respect to terms, conditions, or privileges of employment, because of age; or to limit an employee in any way which would deprive her of employment opportunities or otherwise adversely affect her status as an employee, because of age. <u>See</u> 29 U.S.C. § 623(a). The language of the ADEA is nearly identical to that found in 42 USC § 2000e (Title VII), and the two statutes are similarly interpreted under the <u>McDonnell Douglas</u> burden shifting framework. <u>See</u> <u>Malcolm v. Vicksburg Warren Sch. Dist. Bd. of Trustees</u>, 709 F. App'x 243, 247 (5th Cir. 2017) ("Claims of employment discrimination or retaliation under Title VII and the ADEA premised on circumstantial evidence are analyzed using the framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973)").

To establish a *prima facie* case of an ADEA claim, a plaintiff must show that "(1) [s]he was discharged; (2) [s]he was qualified for the position; (3) [s]he was within the protected class at the time of discharge; and (4) [s]he was either i) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) otherwise discharged because of h[er] age." Kilgore v. Brookeland Indep. Sch. Dist., 538 F. App'x 473, 476 (5th Cir. 2013). If a plaintiff sets forth a *prima facie* case of age discrimination, defendant, as the employer, must articulate a legitimate, nondiscriminatory reason for the employee's discharge. See id. at 476. "If [defendant] carries its burden, [plaintiff] must prove that [defendant's] 'reasons are pretexts for unlawful discrimination either by showing that a discriminatory reason more likely motivated' [defendant] or by showing that [defendant's] 'reason is unworthy of credence.'" Id. at 476 (quoting Bienkowski v. Am. Airlines, Inc., 851 F.2d 1503, 1505 (5th Cir. 1988). The plaintiff "retains the burden of persuading the fact finder that impermissible discrimination motivated the adverse employment decision." Id. (quoting Bienkowski, 851 F.2d at 1505).

In the present action, as indicated *supra*, the Court found that Springhill offered legitimate, nondiscriminatory reasons for the termination of Gilmore. Gilmore has failed to offer evidence that raises a genuine issue of material fact that the reasons offered are pre-textual. Accordingly, Gilmore's ADEA claim is **DISMISSED**.

### F. Gilmore's Retaliation Claim.

Gilmore claims that she was retaliated against for her complaints to the Louisiana Board of Nursing regarding licensing standards and a Registered Nurse leaving a patient in seclusion. See Record Document 1 at 4, ¶ 18, Complaint. "To establish a *prima facie* case of retaliation, an employee must demonstrate that (1) [s]he engaged in an activity

that Title VII protects; (2) [s]he was subjected to an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action." LeMaire v. Louisiana, 480 F.3d 383, 388 (5th Cir. 2007). Here, Gilmore cannot establish a *prima facie* case of retaliation because there is no causal connection between her termination and her complaints to the Louisiana State Board of Nursing. When the adverse action occurs *before* the protected activity, no retaliation claim can be sustained because of the lack of causal connection. Slaughter v. Coll. of the Mainland, Civil Action No. G-12-018, 2016 U.S. Dist. LEXIS 122777, at *20 (S.D. Tex. Sep. 12, 2016) (citing Allbritain v. Tex. Dep't of Ins., Civil Action No. A-12-CA-431-SS, 2014 U.S. Dist. LEXIS 8886, at *28 (W.D. Tex. Jan. 23, 2014) ("Because the termination occurred before the EEOC complaint, this 'protected activity' could not possibly form the basis of a retaliation claim due to the lack of a causal link")). Gilmore was terminated in November 2014 and she admitted in her deposition that she did not submit her complaints to the Louisiana State Board of Nursing until November or December of 2015. See Record Document 19-3 at 82-83, Gilmore Depo., Exhibit A. Further, Gilmore failed to address her retaliation claim in her opposition to Springhill's Motion for Summary Judgment.[1] See Batiste v.

---

[1]Gilmore states that "[s]he feared she would be fired in retaliation for reporting these violations" relating to her alleged report of other nurses for "nursing violations." Record Document 21 at 4. In context, this seems to be related to Gilmore's discrimination claims and unrelated to the allegations set forth in her Complaint and Deposition. For those reasons, the Court assumes that this one sentence is not an attempt to revive her retaliation claim but, even if it was, it is insufficient because it is not a protected activity. See, e.g., Dortch v. Mem'l Herman Healthcare Sys.- Southwest, 525 F. Supp. 2d 849, 866 (S.D. Tex. 2007) ("protected activities under Title VII require that an employee express opposition to activity that the employee reasonably believes is discriminatory"). Gilmore has failed to offer any evidence that she expressed opposition to the activity that she reasonably believed to be discriminatory.

<u>Najm</u>, Civil Action No. 13-5463, 2015 U.S. Dist. LEXIS 181584, at *4 (E.D. La. Apr. 23, 2015) (Summary judgment is conceded to claims left unaddressed in a plaintiff's opposition memorandum.). Therefore, it remains undisputed that her alleged protected activity occurred in 2015 *after* her termination. (emphasis added). Accordingly, Gilmore's retaliation claim fails as a matter of law.

## III.  CONCLUSION

Based on the foregoing analysis, the Court holds that the reasons for Gilmore's termination were legitimate, nondiscriminatory reasons rather than pre-textual. Therefore, Gilmore has failed to meet her burden in her race and age discrimination claims against Springhill. Gilmore's retaliation claim also fails as a matter of law because the alleged protected activity occurred after her termination from Springhill. Accordingly,

**IT IS ORDERED** that the Motion for Summary Judgment (Record Document 19) filed by Springhill be and is hereby **GRANTED** and all claims against Springhill are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Gilmore's Motion to Strike (Record Document 23) be and is hereby **DENIED**.

A Judgment consistent with the terms of the instant Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED**, in Shreveport, Louisiana, on this 3rd day of May, 2018.

S. MAURICE HICKS, JR., CHIEF JUDGE
UNITED STATES DISTRICT COURT